**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **RICHARD ROCKWELL, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| v. ) | No. 3:08-CV-251-M-(BF) |
| ) | |
| **CITY OF GARLAND, TEXAS, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court is Defendants Brown, Burleson, Scicluna, Ohlde, Raley, and Garcia's (collectively, "Officers") "Motion for Summary Judgment on the Issues of Qualified and Official Immunity" (doc. 62). Having reviewed the motion, briefs, evidence and applicable law, the Court finds that summary judgment in favor of the Officers is proper and recommends that the Defendants' Motion be **GRANTED**.

**FACTUAL BACKGROUND**

The facts below are undisputed, except as noted. Where a dispute has been noted, it has been resolved in favor of the nonmovant Plaintiffs. *See Hill v. Carroll County, Miss.*, 587 F.3d 230, 233 (5th Cir. 2009).

In February 2006, Plaintiffs Richard and Cindy Rockwell lived with their son Scott Rockwell at 721 John Glen Drive in Garland, Texas. [Pl. Mot. at 5.][1] Scott had his own bedroom and

---

[1] In citing the case, "Def. Mot." refers to the Defendants' Motion for Summary Judgment (doc. 62); "Def. App." refers to Defendant's Appendix to their Motion for Summary Judgment (doc. 64); 'Pl. Mot." refers to Plaintiffs' Cross-Motion for Summary Judgment (since amended to a Response to Defendants' Motion for Summary Judgment) (doc. 69); "Pl. App." refers to Plaintiffs' Appendix in Support (docs. 69 and 71); "Pl. App. Con." refers to Plaintiffs' Confidential Appendix; "Def. Repl." refers to Defendants' Reply Brief (doc. 79).

contributed to the rent. [*Id.*] Scott suffered from both bipolar disorder and schizophrenia. [*Id.* at 6.] Scott had also been diagnosed as suicidal and had attempted suicide on more than one occasion. [Def. Mot. at 4.] His mental condition and stability began to deteriorate in early February. [*Id.* at 5.] He had quit taking his prescribed medication and refused to see a doctor. [*Id.*] He began hearing voices and was behaving "unpredictably." [*Id.* at 5-6 (quoting Deposition of Richard Rockwell, Pl. App. at 46).] His parents believed he may have been under the influence of illegal drugs. [Pl. Mot. at 9.]

On the evening of February 14, 2006, Scott was in his room hitting the walls and cursing through the door. [*Id.* at 6.] At one point during the evening, Scott came out of his room and raised his fist as if to hit his mother. [*Id.* at 9.] At approximately 8:38 p.m., Scott's parents called 911 because they believed that Scott has become a danger to himself and others. [*Id.* at 6; Def. Repl. at 16.] The 911 dispatcher dispatched Officers Ohlde and Raley to the Rockwell home. [Pl. Mot. at 8.] The dispatcher told the officers that Scott was bi-polar, schizophrenic, off of his medication, and that he was pounding the walls of his room and refusing to come out. [*Id.*] Officer Burleson offered over the radio to come "since there was a potentially dangerous subject there." [*Id.*] Officer Ohlde accepted Burleson's offer of assistance. [*Id.*]

Officer Burleson was the first to arrive at the scene, arriving at approximately 8:45 p.m. [*Id.*] Officers Ohlde and Raley arrived soon thereafter. [*Id.*] At the Rockwell home, Mrs. Rockwell told the police that Scott had schizophrenia, was talking to himself, hadn't taken his medication for several days, refused to come out of his room, and that she believed that Scott was taking illegal drugs. [*Id.* at 9.] When the Officers asked Mrs. Rockwell what Scott would likely do if they were

2

to leave without detaining Scott, she answered that she did not know.[2]

Officers Ohlde, Burleson, and Raley attempted to communicate with Scott through his bedroom door. [*Id*. at 9.] Scott was threatening the officers from his room and had indicated that "he thought someone had put 'cum' in his mouth." [*Id*. at 10; Def. Mot. at 10.] The Officers believed that Scott was suggesting he had been sexually assaulted. [Def. Mot. at 10.] Officer Raley advised Officers Ohlde and Burleson that the SWAT team had been called to respond to Scott on at least one prior occasion and had taken Scott into custody for threatening and assaulting his parents. [*Id*.] At about this time, Officer Ohlde called Lieutenant Brown ("Lt. Brown" or "Brown") who then came to the scene. [Pl. Mot. at 11.] At some point after Lt. Brown was called, but before he arrived, Officer Raley called for another unit. [*Id*. at 17.] Officers Garcia and Scicluna responded to this call. [*Id*.] While Officers Burleson, Raley, and Ohlde waited for the additional units, Scott continued to bang on the walls, shake his door, and make threats to the officers. [*Id*.]

At some point after Lt. Brown arrived, the decision was made to arrest Scott. The decision was made based on the assault by threat made earlier in the evening, Scott's history of violent and suicidal behavior, his unstable mental state, the possibility that Scott was high on drugs, and concern that Scott would harm his parents or himself if left in the residence. [Def. Mot. at 10-11; Pl. App. at 141-43 (Affidavit in Any Fact of Lt. Brown).] When the Officers told Cindy Rockwell that they may have to breach the door to effectuate an arrest, she suggested that she would wait until morning to get a mental-health warrant. [Pl. Mot. at 53.] The Officers, having determined that Scott was a

---

[2]*See* Def. App. at 170 (Deposition of Cindy Rockwell); *see also id.* at 26 (Affidavit of Officer Ohlde) ("Mrs. Rockwell stated that she felt like there could be a possibility of future violence if Rockwell was left to stay in the Residence."). At least one officer claims that Mrs. Rockwell affirmatively feared Scott "would become much worse." *Id*. at 9 (Affidavit of Officer Burleson).

3

threat, decided that it would be unsafe to leave him in the home until morning.[3] The Officers had determined that Scott had barricaded himself inside of his room. [*Id*. at 12.] After making repeated unsuccessful attempts to convince Scott to come out of the room, the police decided to breach the door.[4]

At the time that the breach was made, Officer Scicluna was positioned at the door to kick it in.[5] Lt. Brown ordered Scicluna to get low to stay out of the line of possible gunfire. [*Id*. at 20-21.] Lt. Brown was holding a pepperball gun, and stood in the doorway to the bathroom across the hall from Scott's bedroom, behind Officer Scicluna. [*Id*. at 19.] From the perspective of somebody facing the door into Scott's room from the hallway, Officers Burleson and Ohlde were positioned on the right side of the door, and Officer Raley was positioned on the left side of the door, near Lt. Brown. [*Id*. at 18-19.] Officer Garcia was positioned by the back door. [*Id*. at 19.] Richard and Cindy Rockwell were in the converted garage. [*Id*. at 41.] One of the officers had his gun drawn at

---

[3][*Cf.* Pl. App. at 309 (Deposition of Lt. Brown) ("If [Scott] was acting rational and if there was no need, then he wouldn't need to be arrested.").]

[4][*See, e.g.*, Pl. Mot. at 25; Pl. App. at 76 (Incident/ Investigation Report) ("[T]he Officers continued to try and talk to Scott, but [he] refused to exit the room and continued to yell, curse and strike the walls in the room. It was decided that other action had to be taken to remove Scott from the room.").] Plaintiffs cite the supplemental report for evidence that the officers breached the door in order to locate Scott. [Pl. Mot. at 14 (citing Pl. App. at 75).] This mischaracterizes the report. The report says that "[t]he officers attempted to locate the suspect in the residence and forced entry into the room he was locked in." [Pl. App. at 75.] A plain reading of the report indicates that at the time the door to Scott's room was breached, they knew that he was in the room. The report does not state a reason for the decision to breach the door. Furthermore, Plaintiffs offer no proof that Lt. Brown was "angered" by Scott's refusal to open the door and are not entitled to the Court finding such. [*See* Pl. Mot. at 25.]

[5] [Pl. Mot. at 19.] A diagram approximating the Officers' position at the time of the breach can be found on page 6 of Plaintiffs' Motion for Summary Judgment.

the time of the breach.[6] The door was breached sometime between 9:12 and 9:16 p.m.[7]

Once the door was breached, Scott, holding two eight-inch serrated knives, rushed towards Lt. Brown and attacked him with the knives. [Def. App. at 3 (Affidavit of Lt. Brown); Def. App. at 19 (Affidavit of Officer Raley); Def. App. at 320 (Deposition of Officer Scicluna).] Officer Burleson saw the knives and yelled "knives" to warn his fellow officers. [Def. Mot. at 12.] Lt. Brown began to fire multiple rounds at Scott with the pepperball gun. [Pl. Mot. at 44.] Lt. Brown was able to deflect a number of these attacks with his pepperball gun. [Def. Mot. at 13.] During the scuffle, Scott pushed Lt. Brown back into the bathroom with enough force that the commode broke. [*Id.*; Pl. Mot. at 45.] Scott then turned and began to run after Officer Scicluna while still swinging his knives.[8] Scott swung the knives at Officer Scicluna, injuring him. [Pl. Mot. at 44.] At about this time, the officers shot at Scott.[9]

---

[6] *See* Answer to the Amended Complaint ¶ 25 (admitting that at least one officer had his gun drawn at the time of the breach). Officers Brown, Burleson and Scicluna affirmatively deny that they were the ones to have their weapon drawn. Def. App. at 3 (Affidavit of Lt. Brown) (stating that he was unable to unholster his firearm); *Id.* at 8 (Affidavit of Officer Burleson) (stating that he unholstered his firearm after Scott began attacking the officers); *Id.* at 22-23 (Affidavit of Officer Scicluna) (same).

[7] *See* Pl. Mot. at 40 (noting that Lt. Brown cleared the radio at 9:12 and a call to EMS was made at 9:16).

[8] Plaintiffs argue that the reasonable inference is that Scott Rockwell was running toward the exit, and not toward Officer Scicluna. *See, e.g.*, Def. Mot. at 45. However, it is undisputed that Rockwell was armed, had already attacked Scicluna and Lt. Brown, and that Scicluna and the exit were in the same general direction relative to Scott. Under these circumstances, Scott's subjective intent is immaterial to the reasonableness of the officers' actions.

[9] *See* Def. App. at 22 (Affidavit of Officer Scicluna) ("As I continued to back up into the living room I heard several gun shots."); *Id.* at 3 (Affidavit of Lt. Brown) ("As Rockwell and I separated, he turned and started running west in the hallway. Rockwell was still swinging the knives . . . . [I] was unable to see what transpired from that point. I was able, however, to hear several gunshots, fired in rapid succession."); Pl. App. at 303 (Deposition of Lt. Brown) ("in the process of – of fighting with [Scott], I started discharging the pepper ball gun in hopes that it would get him

5

Officer Burleson fired one shot which hit Scott in the abdomen. [Pl. Mot. at 35.] Officer Raley fired three shots, two of which hit Scott. [*Id*. at 36]. One of Officer Raley's shots created stipling on Scott's neck, which is generally indicative of a shot fired two feet or less from the target. [*Id*.] Scott fell down in front of Officer Scicluna. [*Id*.] Officers Scicluna fired one shot, which hit Scott in the chin and neck. [*Id*. At 38-39.] Officer Garcia fired either once or twice, but did not hit Scott.[10] [*Id*. at 39]. Officers Ohlde and Lt. Brown did not fire any shots from their firearms. [*Id*. at 40.] In total six or seven shots were fired. The shots were mostly fired in rapid succession. [Def. App. at 3 (Affidavit of Lt. Brown); *Id*. at 203-204 (Deposition of Cindy Rockwell) (one shot was followed by several fired in rapid succession).] Four of the shots hit Scott,[11] and one hit Officer Raley. [Pl. Mot. at 37.] No party suggests that Scott had a gun or shot Officer Raley. Scott received wounds to the chin, neck, chest, forearm, and abdomen. [Pl. App. Con. at 94.]

At approximately 9:16, the Officers called for EMS and reported that Scott had been shot. Scott was pronounced dead at 10:04 p.m. [Pl. Mot. at 40-41.]

## STANDARDS OF LAW

### Summary Judgment

In evaluating a motion for summary judgment, the court must resolve all disputed facts and construe all reasonable inferences in favor of the nonmovant. *Hill v. Carroll County, Miss.*, 587 F.3d 230, 233 (5th Cir. 2009). Summary judgment must be granted if "there is no genuine issue as to any

---

off of me . . . . [T]he pepper ball gun was fired before any gunshots, multiple times.")]

[10]There is some dispute over the whether Officer Garcia fired one or two shots. *Compare* Pl. App. 157 (stating that Officer Garcia fired 1 to 2 shots) *and* Def. App. 78 (showing two shots discharged from Officer Garcia's firearm) *with* Def. App. at 13 (stating that Garcia fired one shot); Pl. App. Con. at 94 (showing a total of six fired shots).

[11]*See* Plaintiffs' Second Amended Complaint at 2.

material fact and [the court finds] that the movant is entitled to judgment as a matter of law." *Id*. (quoting FED. R. CIV. P. 56(c)). "No genuine issue as to any material fact exists where a party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id*. at 233-34.

### **Excessive Force**

In order to succeed on an excessive force claim, a plaintiff must show that he was seized and that he "suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Ballard v. Burton*, 444 F.3d 391, 402 (5th Cir. 2006) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Id*.

### **Qualified Immunity**

Qualified immunity shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Court's qualified immunity inquiry examines whether the "defendant's conduct violated a constitutional right" and whether "the alleged right was clearly established at the time of the misconduct." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). The court may choose in which order to navigate these two prongs. *Id*.

7

Even if the evidence supports a conclusion that Plaintiffs' rights were violated, qualified immunity may still be invoked unless "the government official violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 845. "Qualified immunity shields from civil liability all but the plainly incompetent or those who knowingly violate the law." *Id*. (internal quotations omitted). A right "must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Id*. at 846 n.4 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

**State Law Claims and Official Immunity**

Plaintiffs also assert state law causes of action for assault and battery against the Officers. "A tortious civil assault is committed if a person intentionally, knowingly, or recklessly causes bodily injury to another." *DeLeon v. Hernandez*, 814 S.W.2d 531, 533 (Tex. App. – Houston [14th Dist.] 1991). Battery requires only an offensive touching. *Price v. Short*, 931 S.W.2d 677, 687 (Tex. App. – Dallas 1996).

The Officers have pleaded the affirmative defense of official immunity to these counts. *See Kersey v. Wilson*, 69 S.W.3d 794, 799 (Tex. App. – Fort Worth 2002) (noting that "several courts have applied official immunity in cases involving allegations of intentional torts such as assault arising from police activity"). In Texas, "[o]fficial immunity protects public officials from suit arising from performance of their (1) discretionary duties (2) in good faith (3) within the scope of their authority." *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 422 (Tex. 2004). Only the presence of good faith is disputed. "To controvert [an] officer's summary judgment proof on good faith, the plaintiff . . . must show that 'no reasonable person in the defendant's position could have though the facts were such that they justified defendant's act.'" *City of Lancaster v. Chambers*,

8

883 S.W.2d 650, 657 (Tex. 1994). The test for good faith is objective and substantially derived from the test for good faith in a qualified immunity claim for federal constitutional violations. *Roe v. Texas Dept. of Protective and Regulatory Servs.*, 299 F.3d 395, 413 (5th Cir. 2002); *see also Cantu v. Rocha*, 77 F.3d 795, 808 (5th Cir. 1996) ("Texas' law of qualified or official immunity is substantially the same as federal immunity law."). However, unlike qualified immunity in the federal system, a showing that the right alleged to have been violated was not clearly established is insufficient to succeed on summary judgment defense. *Cantu*, 77 F.3d at 808-09.

## ANALYSIS

### Excessive Force

The Court's inquiry into the Officers' use of deadly force is limited only to the moment that they fired their weapons. *See Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001) ("The excessive force inquiry is confined to whether the Trooper was in danger *at the moment of the threat* that resulted in the [Defendants'] shooting."); *Fraire v. Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) ("Regardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm."); *see also Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985) (finding that an officer's use of deadly force was reasonable even where the arrest was "negligently executed"). Though the exact timing of when the shots were fired is unclear, it is clear that at the moment shots were fired, Scott had run out of his room swinging eight-inch knives in both hands and was either engaged with Lt. Brown or had thrown Lt. Brown into the bathroom and was running in the direction of Officers

9

Scicluna, Raley, and Garcia while continuing to swing the knives.[12] Under these circumstances, the Officers' determination that Scott posed a threat to their safety was not unreasonable. Scott's subjective intent is immaterial; therefore, the Court need not examine whether Scott intended to run for the exit or for the police officers who were in the same direction. For the same reason, it is immaterial whether Scott was able to appreciate that he was attacking police officers.

Plaintiffs ask the Court to infer that at least two of the shots were excessive because they were fired after Scott had been downed by at least one bullet, presumably that of Officer Burleson. Officer Scicluna admits that Rockwell was down when he fired his shot, but testifies that Scott was trying to get back up to continue the attack. [Pl. Mot. at 57; Pl. App. at 321-22 (Deposition of Officer Scicluna).] Regarding the shot attributable to Officer Raley, Plaintiffs asks for the inference based on the downward trajectory of a shot to Scott's head and neck and the fact that Scott was taller than Raley. [Pl. Mot. at 35-36.] However, the material question is not whether Scott was down, but whether the Officers reasonably perceived him to be a threat at the time the shots were fired.

The Officers, who are the only eyewitnesses, have testified that at the time of the shots, Scott was attacking them with knives. The fact that Officers Scicluna and Lieutenant Brown were

---

[12]Plaintiffs ask the Court to infer that Officer Raley shot Scott as soon as he ran out of the door. [Pl. Mot. at 33-34.] The Court does not think that the inference is reasonable in light of the evidence. The only support for the inference is that the wound to Scott's left arm *may* have come from Raley's weapon and may have come while Scott was charging out of the room with his arms raised. [*Id.*; Pl. App. Con. 94 (showing that the forearm wound came either from the shot to Scott's abdomen or to Scott's chest).] However, all testimony is that the shots were fired after Scott attacked Lt. Brown. Furthermore, it is undisputed that Officer Raley was to the left of Scott's from the point of view facing the door. [Pl. Mot. at 33.] However, because Officer Raley's bullet was removed from Scott's chest, it would have had to hit Scott's arm before passing through to the chest, which could only happen if Raley was shooting from the right side of Scott's door. Even assuming arguendo that the Plaintiffs' assertion is correct, it would not be unreasonable for Officer Raley to use deadly force when Scott began charging at a fellow officer with knives, which would still be the case under Plaintiffs' requested inference.

10

attacked is supported by proof of knife injuries submitted into evidence. Furthermore, Cindy Rockwell testified that one gunshot was followed by several gunshots in rapid succession. Thus, there was no "cooling down" period after which shots were fired. The only reasonable inference from the evidence is that all of the shots were fired in the midst of the attack, not in the aftermath. Similarly, the stipling on Scott's neck, indicating that one shot was fired from less than two feet away, supports, rather than detracts from, a conclusion that Scott, wielding knives, presented a threat of serious harm to Officer Raley when he fired the shot. For these reasons the Court finds that the Officers could reasonably have perceived Scott to pose a threat of serious harm at the time the shots were fired. Therefore, the Officers are entitled to qualified immunity as to their use of deadly force.

**Assault and Battery**

Because the Court finds that the Officers' use of deadly force was reasonable under the totality of the circumstances, the Court also recommends that the state law claims be dismissed on grounds of official immunity.

**"Bad Entry"**

Plaintiffs add a claim for "bad entry" in their Second Amended Complaint. Though the charge was added to the complaint after the motion for summary judgment, the Court, by separate order, has determined that the Complaint was properly amended. The facts underlying the additional counts were laid out in Plaintiffs' response, and the Defendants addressed them in reply. The Court finds that further briefing on the matter is not needed.

As noted above, the Court rejects Plaintiffs' attempts to connect the breach of Scott's door with the Officers' use of deadly force. The breach of the door was neither the moment where deadly force was employed nor did Scott's death result "directly and only" from the breach of the door.

11

However, the breach of the door may be actionable as an independent violation of Plaintiffs' rights. *See, e.g., Covington v. Cole*, 528 F.2d 1365, 1370 (5th Cir 1976).

The claim for "bad entry" is essentially three separate claims: 1) the Officers violated Scott's "federal right to be free from a warrantless misdemeanor arrest;" 2) the Officers violated Scott's right [to be free from] warrantless entry to arrest for a misdemeanor;" and 3) the Officers' "entry violated article 15.25 of the Texas Code of Criminal Procedure, which permits forcing a residential door without a warrant only for a felony arrest." [Pl. Second Amend. Compl. at 59.] The Court will address each of these claims separately.

*Warrantless Arrest for a Misdemeanor*

Plaintiffs claim that the arrest of Scott Rockwell violated his right to be free from a warrantless misdemeanor arrest. However, the Officers' determination that they had probable cause to arrest Scott for a criminal misdemeanor was not the sole factor in the determination to arrest Scott. Lt. Brown testified that an arrest would not have occurred but for the threat to the safety of himself and his parents.[13]

Assuming arguendo that the arrest was for the sole purpose of enforcing a misdemeanor, Plaintiffs' claim must still fail. At the time of the arrest there was no clearly established right against arrest for misdemeanors not conducted in the presence of an officer. *See Barlow v. Galveston*, 400 F. Supp. 2d. 980, 982 (S.D. Tex 2005) (citing *Atwater v. City of Lago Vista*, 532 U.S. 218, 340 n.11 (2001)). Furthermore, the Officers had statutory authority to arrest Scott. In Texas, police may "arrest, without warrant . . . persons who the peace officer has probable case to believe have committed an offense involving family violence." TEX. CODE. CRIM. PRO. ANN., art. 14.03.

---

[13]*See* footnote 3 and accompanying text, *supra*.

Texas law defines "family violence" as "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury . . . or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault or sexual assault." TEX. FAM. CODE ANN. § 71.004; *see also* TEX. CODE CRIM. PRO. ANN., art. 14.03 (adopting this definition).  Courts have routinely noted that, where a law is not patently unconstitutional, officers should not be put in the position of second-guessing the constitutionality of laws they enforce.  *See*, *e.g.*, *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.") (quoting *Michigan v. Defillippo*, 443 U.S. 21, 38 (1979)); *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994) ("[A]n officer who reasonably relies on the legislature's determination that a statute is constitutional should be shielded from personal liability.").  Therefore, the Court finds the Officers entitled to qualified immunity in connection to the arrest of Scott Rockwell.

*Violation of Texas Code of Criminal Procedure, art. 15.25*

Plaintiffs also claim that Scott's rights were violated when the Officers breached his door to effectuate the arrest. *See* TEX. CODE OF CRIMINAL PROCEDURE ANN., art. 15.25.  The fact that the Officers were responding to a current threat, and not merely effectuating a misdemeanor arrest renders the applicability of the statute to this situation ambiguous at best.  However, the Court need not reach that issue.  Assuming that the breach of the door was a violation of state procedure, it does not rise to the level of a constitutional violation, and it inadequate to support a § 1983 claim. *See Price v. Brittain*, 874 F.2d 252, 261-62 (5th Cir. 1989) ("officials sued for constitutional violations

13

do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.") (quoting *Davis v. Scherer,* 468 U.S. 183 , 194 (1984)); *Fraire*, 957 F.2d at 1276 ("even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections").  The Court likewise finds that Plaintiffs' claim that the SWAT team or a mental health officer should have been called fails to show a constitutional violation.

For this reason, the Court also gives little weight to the testimony of Roger Turner.  At most, Mr. Turner is qualified to testify as to whether police procedure was violated.  Though the Court should consider procedure as a part of its "reasonableness" inquiry, Mr. Turner's testimony that the Officers acted unreasonably is a legal conclusion to which the Court affords no weight.  *See* FED. R. EVID. 704(a); *United States v. Williams*, 343 F.3d 423, 435 (5th Cir. 2003).

*Entry into Scott's room*

Warrantless searches and seizures made inside someone's home are presumptively unreasonable unless consent is given or exigent circumstances are present.  *See United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993) (citing *Payton v. New York*, 445 U.S. 573, 586, 590 (1980)).

Here the officers had consent of Richard and Cindy Rockwell to enter the Rockwell home, but not to enter Scott's room. *United States v. Ho*, 94 F.3d 932, 936 n.5 (5th Cir. 1996) ("A consent which waives Fourth Amendment rights may be limited, qualified or withdrawn.").  Though Defendants claim that Scott Rockwell consented to the Officers entering the room, given Scott's mental instability, the Court is not prepared to say that there is "no genuine issue" as to whether Scott consented to the Officers' entry.

14

Therefore, the Officer's must show that there were exigent circumstances under which it was reasonable for them to enter Scott's room. Exigent circumstances exist where the "societal costs of obtaining a warrant . . . outweigh the reasons for prior recourse to a neutral magistrate." *United States v. Hicks*, 389 F.3d 514, 527 (5th Cir. 2004). "There is no set formula for determining when exigent circumstances may justify a warrrantless entry." *United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009). "As a general rule, exigent circumstances exist when there is a genuine risk that officers or innocent bystanders will be endangered . . . if entry is delayed until a warrant can be obtained." *Id.* When examining whether exigent circumstances existed, the Court "should consider the appearance of the scene . . . as it would appear to reasonable and prudent men standing in the shoes of the officers" and not "examine each act in isolation and inquire whether the officers could have acted differently." *Id.* (internal quotations omitted).

In this instance, the primary question is whether the Officers were reasonable in determining that Scott was a threat to his parents, the Officers, or himself**.** *See, e.g.*, *United States v. Newman*, 472 F.3d 233, 237-38 (5th Cir.2006) ("Exigent circumstances existed if the agents' fear for their safety was reasonable."); *Russo v. Cincinnati*, 953 F.2d 1036, 1043 (6th Cir. 1992) ("[W]e find that these uncontroverted facts led Sizemore to believe that Bubenhofer was in danger of committing suicide, thus convincing him that immediate entry into the apartment was necessary."). Here, when the officers decided to enter Scott's room, the Officers: 1) knew that Scott's mother had called 911 for help involving Scott, 2) knew that Scott was schizophrenic, bi-polar and not taking his medication, 3) had probable cause to believe that Scott had left his room earlier that night and threatened to hit his mother, 4) knew that Scott was threatening his parents while yelling through the door, 5) knew that Cindy Rockwell felt threatened by Scott, 6) knew that Scott had been

15

threatening the Officers personally by yelling through the door, 7) knew that Scott had a history of violence against his parents, 8) heard Scott banging against the walls and shaking his door aggressively, 9) had been told that it was unknown whether Scott's condition would improve if the Officers left without taking him along, 10) had reasonable suspicion that Scott was involved with illegal drugs based on his mother's testimony and his observed behavior, 11) knew that Scott had a history of being suicidal, 12) knew Scott was either armed or potentially armed, and 13) believed Scott to be claiming that he had been sexually molested. Given these factors, it was not unreasonable for the Officers to determine they were justified in opening Scott's room to protect his parents, to protect themselves, and to protect Scott.

<u>The Officers Reasonably Believed Scott Was a Threat to His Parents</u>

Considering the totality of the circumstances, the Officers were reasonable in determining that Scott had to be removed from the home because he posed a substantial risk of harm to his parents. *See Tierney v. Davidson*, 133 F.3d 189, 198 (2d Cir. 1998) ("Indeed, it may have been a dereliction of duty for [the officer] to have left the premises without ensuring that any danger had passed."). Though Mrs. Rockwell suggested that she was willing to wait until morning to get a mental-health warrant, the Officers were then personally aware of the situation and were allowed to make an independent determination. *Id.* ("Exigent circumstances do not end merely because the victim indicates that she is no longer in danger. That is a determination for the officer to make independently in light of the totality of the circumstances."). Indeed, Mrs. Rockwell herself believed that Scott was a danger to himself and others at the time the arrest was made. [Pl. App. at 207-208.]

The Officers' determination that action was required was particularly reasonable given the domestic nature of the dispute. Courts have noted that domestic disputes are particularly

16

combustible and have therefore noted special deference to officers at the scene of such disputes. *See id*. at 197 ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger."); *United States v. Rodriguez*, 601 F.3d 402, 408 (5th Cir. 2010) ("Although the situation was seemingly calm at their arrival, domestic disputes often involve high emotions and can quickly escalate to violence."). The Texas legislature has likewise noted the gravity of domestic violence. TEX. CODE OF CRIM. PROC. ANN., art. 5.01, Legislative Statement (1985) ("Family violence is a serious danger and threat to society and its members. Victims of family violence are entitled to the maximum protection from harm or abuse or the threat of harm or abuse as is permitted by law."); TEX. CODE CRIM. PRO. ANN., art. 14.03 (authorizing warrantless arrest where there is probable cause of family violence).

### The Officers Reasonably Believed Scott Was a Threat to Himself

In addition, it was reasonable for the officers to enter based on the threat Scott posed to himself. Under similar facts, the Sixth Circuit held that exigent circumstances justified the entry of officers into an apartment in order to prevent a suicide. *Russo*, 953 F.2d at 1043-44.

### The Officers Reasonably Believed Scott Was a Threat to Their Safety

Courts have generally given wide latitude to police officers regarding threats to their own safety. Though not perfectly on point, the doctrine of protective sweep announced in *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093 (1990), which outlines what officers may do in the interest of preventing harm to themselves, is most analogous to the facts at hand, and may provide guidelines to determining whether the Officers' actions were reasonable. *See United States v. Scoggins*, 599

F.3d 433, 440 (5th Cir. 2010) ("the ultimate touchstone of the Fourth Amendment is 'reasonableness'") (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). Though in most cases, a protective sweep involves searching for "an unknown threat posed by hidden third parties," there is "nothing in the reasoning of *Buie* that prohibits its application to sweeping for obvious or known threats." *United States v. Miller*, 430 F.3d 93, 101 n.4 (2d Cir. 2005). Indeed, it would follow from the fact that police are allowed to sweep an area for unknown threats that once a threat is discovered, law enforcement officers are allowed to respond to it.

In *United States v. Gould*, 364 F.3d 578 (2004), the Fifth Circuit, sitting en banc, examined the parameters of protective sweeps. The Court noted that a protective sweep need not be in connection with an arrest. *Id*. at 586. Rather, a protective sweep is valid if the officers are legally within the home, have a "reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene," limit the sweep to a "cursory inspection of those spaces where a person may be found," and conduct the sweep no longer than is necessary to dispel the reasonable suspicion of danger and no longer than the police are justified in remaining on the premises. *See id*. at 588 (quoting *Buie*, 110 S. Ct. at 1099-1100) (internal quotations and citations omitted).

Here, the Officers had consent of Richard and Cindy Rockwell to enter the home, so they were legally within the home. Scott was in a clearly agitated state and "posed a danger to those on the scene." Because Scott was still clearly unstable and was threatening the Officers, the Officers maintained a reasonable suspicion of danger and were justified in remaining on the premises in order to prevent Scott from harming himself or others. As courts have noted, threats presented in a person's home "puts the officer at the disadvantage of being on his adversary's 'turf.'" *Id*. at 584

(quoting *Buie*, 110 S. Ct. at 1098). Under these circumstances, "[a]nticipation of a violent confrontation was reasonable." *See Newman*, 472 F.3d at 238.

*The exigency was not manufactured.*

Nor did the Officers manufacture the exigency. At least two grounds for the exigent circumstances, the threat to Scott's parents and the threat of Scott to himself, existed before the Officers arrived. Furthermore, the Officers' interaction with Scott before the door was breached were limited to their entering the home with the permission of Scott's parents and talking to Scott through the door. Talking to Scott through the door is essentially a "knock and talk," which in the Fifth Circuit is legitimate and does not "manufacture" the exigency. *See id*. at 238-39.

**Failure to Intervene**

Because the Court finds that the Officers at no point violated Scott Rockwell's clearly established rights, the Court finds no liability based upon any officer's failure to intervene.

**RECOMMENDATION**

For the foregoing reason, the Court recommends that the Officers' motion for summary judgment be granted and all claims against them be dismissed. Because the Court recommends granting summary judgment, the Court further recommends that Defendants' objections to Plaintiffs' summary judgment evidence (doc. 80) be denied as moot.

**SO RECOMMENDED,** June 10, 2010.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

19

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).