UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RICHARD and CINDY ROCKWELL, | § | |
| Individually and as Co-Administrators of the | § | |
| Estate of SCOTT ROCKWELL, Deceased, | § | |
| | § | |
| Plaintiffs, | § | No. 3:08-cv-0251-M |
| | § | |
| v. | § | |
| | § | |
| CITY OF GARLAND, TEXAS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Summary Judgment, filed by Defendant the City of Garland, Texas ("Defendant" or "the City") [Docket Entry #134]. For the reasons articulated at the December 17, 2012 hearing, and for those set forth below, the Motion is **GRANTED**.

I.   BACKGROUND

United States Magistrate Judge Stickney summarized the factual background of this case in his Findings, Conclusions, and Recommendation ("FCR") [Docket Entry #95] on Defendants' Motion for Summary Judgment on issues of qualified and official immunity [Docket Entry #62]:[1]

> In February 2006, Plaintiffs Richard and Cindy Rockwell lived with their son Scott Rockwell at 721 John Glen Drive in Garland, Texas. Scott had his own bedroom and contributed to the rent. Scott suffered from both bipolar disorder and schizophrenia. Scott had also been diagnosed as suicidal and had attempted suicide on more than one occasion. His mental condition and stability began to

---

[1] The facts are undisputed, except as noted. Where a dispute has been noted, it has been resolved in favor of the nonmovant Plaintiffs. *See Hill v. Carroll County, Miss.*, 587 F.3d 230, 233 (5th Cir. 2009). Citations to the first summary judgment record have been omitted.

deteriorate in early February. He had quit taking his prescribed medication and refused to see a doctor. He began hearing voices and was behaving "unpredictably." His parents believed he may have been under the influence of illegal drugs.

On the evening of February 14, 2006, Scott was in his room hitting the walls and cursing through the door. At one point during the evening, Scott came out of his room and raised his fist as if to hit his mother. At approximately 8:38 p.m., Scott's parents called 911 because they believed that Scott has become a danger to himself and others. The 911 dispatcher dispatched Officers Ohlde and Raley to the Rockwell home. The dispatcher told the officers that Scott was bi-polar, schizophrenic, off of his medication, and that he was pounding the walls of his room and refusing to come out. Officer Burleson offered over the radio to come "since there was a potentially dangerous subject there." Officer Ohlde accepted Burleson's offer of assistance.

Officer Burleson was the first to arrive at the scene, arriving at approximately 8:45 p.m. Officers Ohlde and Raley arrived soon thereafter. At the Rockwell home, Mrs. Rockwell told the police that Scott had schizophrenia, was talking to himself, hadn't taken his medication for several days, refused to come out of his room, and that she believed that Scott was taking illegal drugs. When the Officers asked Mrs. Rockwell what Scott would likely do if they were to leave without detaining Scott, she answered that she did not know.

Officers Ohlde, Burleson, and Raley attempted to communicate with Scott through his bedroom door. Scott was threatening the officers from his room and had indicated that "he thought someone had put 'cum' in his mouth." The Officers believed that Scott was suggesting he had been sexually assaulted. Officer Raley advised Officers Ohlde and Burleson that the SWAT team had been called to respond to Scott on at least one prior occasion and had taken Scott into custody for threatening and assaulting his parents. At about this time, Officer Ohlde called Lieutenant Brown ("Lt. Brown" or "Brown") who then came to the scene. At some point after Lt. Brown was called, but before he arrived, Officer Raley called for another unit. Officers Garcia and Scicluna responded to this call. While Officers Burleson, Raley, and Ohlde waited for the additional units, Scott continued to bang on the walls, shake his door, and make threats to the officers.

At some point after Lt. Brown arrived, the decision was made to arrest Scott. The decision was made based on the assault by threat made earlier in the evening, Scott's history of violent and suicidal behavior, his unstable mental state, the possibility that Scott was high on drugs, and concern that Scott would harm his parents or himself if left in the residence. When the Officers told Cindy Rockwell that they may have to breach the door to effectuate an arrest, she suggested that she would wait until morning to get a mental-health warrant. The Officers, having determined that Scott was a threat, decided that it would be unsafe to leave him in the home until morning. The Officers had determined that Scott had barricaded himself inside of his room. After making repeated unsuccessful attempts to convince Scott to come out of the room, the police decided to breach the door.

At the time that the breach was made, Officer Scicluna was positioned at the door to kick it in. Lt. Brown ordered Scicluna to get low to stay out of the line of possible gunfire. Lt. Brown was holding a pepperball gun, and stood in the doorway to the bathroom across the hall from Scott's bedroom, behind Officer Scicluna. From the perspective of somebody facing the door into Scott's room from the hallway, Officers Burleson and Ohlde were positioned on the right side of the door, and Officer Raley was positioned on the left side of the door, near Lt. Brown. Officer Garcia was positioned by the back door. Richard and Cindy Rockwell were in the converted garage. One of the officers had his gun drawn at the time of the breach. The door was breached sometime between 9:12 and 9:16 p.m.

Once the door was breached, Scott, holding two eight-inch serrated knives, rushed towards Lt. Brown and attacked him with the knives. Officer Burleson saw the knives and yelled "knives" to warn his fellow officers. Lt. Brown began to fire multiple rounds at Scott with the pepperball gun. Lt. Brown was able to deflect a number of these attacks with his pepperball gun. During the scuffle, Scott pushed Lt. Brown back into the bathroom with enough force that the commode broke. Scott then turned and began to run after Officer Scicluna while still swinging his knives. Scott swung the knives at Officer Scicluna, injuring him. At about this time, the officers shot at Scott.

Officer Burleson fired one shot which hit Scott in the abdomen. Officer Raley fired three shots, two of which hit Scott. One of Officer Raley's shots created stipling on Scott's neck, which is generally indicative of a shot fired two feet or less from the target. Scott fell down in front of Officer Scicluna. Officer Scicluna fired one shot, which hit Scott in the chin and neck. Officer Garcia fired either once or twice, but did not hit Scott. Officers Ohlde and Lt. Brown did not fire any shots from their firearms. In total six or seven shots were fired. The shots were mostly fired in rapid succession. Four of the shots hit Scott, and one hit Officer Raley. No party suggests that Scott had a gun or shot Officer Raley. Scott received wounds to the chin, neck, chest, forearm, and abdomen.

At approximately 9:16, the Officers called for EMS and reported that Scott had been shot. Scott was pronounced dead at 10:04 p.m.

*FCR* at 1–6.

In their Second Amended Complaint, Plaintiffs asserted claims for: (1) failure to accommodate Scott's alleged disability under the Americans with Disabilities Act ("ADA"); (2) excessive force and "bad entry" under the Fourth Amendment; and (3) Texas state law assault and battery. Magistrate Judge Stickney recommended granting summary judgment for the individual officers on the grounds that they were entitled to qualified immunity on the Fourth

Amendment claims, and official immunity on the state law claims. This Court accepted the FCR [Docket Entry #102], and the Fifth Circuit affirmed the decision in *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 2433 (2012). After the Supreme Court denied certiorari, Plaintiffs moved to dismiss all but their ADA claim [Docket Entry #124]. The City moved for summary judgment on the ADA claim, the sole remaining claim.

## II.  LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a reasonable jury could return a verdict for the non-moving party, then there is a genuine dispute of material fact. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir. 1998). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate, by designating specific facts beyond the pleadings that prove the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 250; *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir. 1991). In determining whether a genuine dispute of material fact exists, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that a controversy exists." *Lynch Props.*, 140 F.3d at 625 (citation omitted).

III. ANALYSIS

Plaintiffs' claim arises under title II of the ADA, 42 U.S.C. § 12102. To prevail under this statute, a plaintiff must show: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (citing *Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). Here, Plaintiffs sue over Scott's disability.

As to the first prong, Plaintiffs claim that Scott suffered from bi-polar disorder and schizophrenia, allegedly qualifying disabilities under the ADA. With respect to the other two prongs, Plaintiffs allege that the City "excluded Scott from participation in, or denied him the benefits of, the Department's services, programs, and activities as they relate to checking on and securing the welfare of mentally disabled and emotionally disturbed persons." *Pls.' Second Am. Compl.* at ¶ 42. According to Plaintiffs, the City's specific actionable conduct included failing to: (1) leave the home or leave Scott in his room once all the officers had arrived and Scott was locked in his room; (2) follow industry standards for police encounters with mentally disabled persons, such as those promulgated by the Texas Commission on Law Enforcement Officer Standards and Education; (3) follow the City's policies for encounters with mentally disabled persons; and (4) call for a S.W.A.T. deployment or a mental-health peace officer. The parties agree that Plaintiffs' claim rests exclusively on the conduct and decisions of the officers before they entered Scott's room, and not on the ensuing events.

The City asserts two broad bases for summary judgment. First, the City claims Plaintiffs are collaterally estopped from pursuing their ADA claim because several essential elements have

already been decided in the City's favor. Second, the City argues that even if Plaintiffs are not precluded from bringing their ADA claim, Plaintiffs have failed to establish a genuine issue of material fact as to necessary elements of the claim.

    **A.**    **Plaintiffs are not collaterally estopped from bringing their ADA claim.**

Under certain circumstances, the doctrine of issue preclusion—or collateral estoppel—can bar a party from relitigating an issue that has already been adjudicated. For the doctrine to apply, however: "(1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a part of the judgment in that earlier action." *In re Southmark Corp.*, 163 F.3d 925, 932 (5th Cir. 1999) (citation omitted). Collateral estoppel may operate in a proceeding that involves separate claims, but "[r]elitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." *Id.*

The "general rule is that if a judgment is appealed, collateral estoppel only works as to those issues specifically passed upon by the appellate court." *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir. 1981); *see also Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986) ("[I]f an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground") (citing cases). "[O]nce an appellate court has affirmed on one ground and passed over another, preclusion does not attach to the ground omitted from its decision." *Dow Chemical v. U.S. E.P.A.*, 832 F.2d 319, 323 (5th Cir. 1987) (citing 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4421 (1981)).

The City contends Plaintiffs are estopped from disputing that: (1) exigent circumstances were present; (2) the entry and arrest were lawful; and (3) Scott, not the officers, caused the deadly use of force. According to the City, each of these findings negates an element of Plaintiffs' claim, and provides an independent basis for summary judgment.

None of the issues that were decided by this Court, and that have survived appellate review, are identical to the issues in the ADA claim. Plaintiffs are not, therefore, collaterally estopped from pursuing it. Magistrate Judge Stickney's conclusions arose in the context of a qualified immunity analysis. In this context, courts are to determine whether a defendant's actions violated a plaintiff's legally-protected right, and if so, whether that right was clearly established at the time of the violation. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). The Fifth Circuit has recognized that "a court may rely on either prong of the defense in its analysis." *Id.* Accordingly, if a court determines that no right has been violated, then it does not determine whether that nonexistent right was clearly established. Conversely, if a court concludes that conduct does not violate clearly established law, it need not determine whether that conduct in fact violated the law.

Here, Magistrate Judge Stickney held, and this Court agreed, that exigent circumstances were present as a matter of law, and that the officers' entry into Scott's room did not violate the Fourth Amendment. The Fifth Circuit, though affirming the result, approached the analysis from a different perspective. *Rockwell*, 664 F.3d at 994–96. The panel implicitly agreed that when the officers decided to enter Scott's room, Scott was a threat to himself.[2] But the panel did *not* hold that the threat Scott posed to himself established, as a matter of law, an exigent

---

[2] Unlike Magistrate Judge Stickney, the Fifth Circuit did not address whether the officers could have reasonably viewed Scott as presenting a threat to the officers or his parents.

Page **7** of **13**

circumstance justifying the decision to enter Scott's room. Nor did the panel hold that the entry was in fact lawful, or that Scott caused his own injuries. Instead, the Fifth Circuit held simply that the officers were not unreasonable in believing that such a threat gave rise to exigent circumstances, and therefore, that their actions did not violate *clearly established law*.[3]

Even assuming the exigency analyses of the Fourth Amendment and the ADA are identical, the Fifth Circuit's narrow holding is not conclusive of the issues now before the Court. The defense of qualified immunity is not available to municipalities. *See Owen v. City of Independence,* 445 U.S. 622, 638 (1980) (A "municipality may not assert the good faith of its officers or agents as a defense to liability."). Thus, whether the law was clearly established is of no moment. Instead, the only finding with the potential to collaterally estop Plaintiffs would be a conclusion that, as a matter of law, the situation created exigent circumstances. The Fifth Circuit did not so hold. Therefore, the issue already decided and that is now before the Court are not identical, and Plaintiffs are not collaterally estopped from pursuing their ADA claim.

**B.      Plaintiffs cannot succeed on the merits of their ADA claim.**

Defendant argues that even if Plaintiffs are not precluded from contesting the officers' decision to enter Scott's room, Plaintiffs have not established a genuine issue of material fact as to the essential elements of an ADA claim. Specifically, the City claims the undisputed facts establish that: (1) Scott's actions established exigent circumstances, thereby removing the officers' actions from the ambit of the ADA; (2) Scott was not a "qualified individual" as defined by the ADA; and (3) the police did not discriminate against Scott or deny him services based on

---

[3] In contrast, in the excessive force context, the Fifth Circuit determined that the officers had violated no right, not merely that they had violated no clearly established right. *Rockwell*, 664 F.3d at 993 ("[T]he officers' use of deadly force was objectively reasonable. Because we hold that Scott's Fourth Amendment right to be free from excessive force was not violated, we need not consider the issue of whether that right was clearly established.").

his disability. The Court agrees that the ADA does not apply to the officers' actions because it was reasonable, as a matter of law, for them to believe they faced exigent circumstances. Assuming the ADA did apply, moreover, the accommodations that Plaintiffs requested are not reasonable, and are not required under the law. Finally, even if the officers violated the ADA by entering Scott's room, Scott's subsequent actions broke the causal chain between the violation and the ultimate injury. Plaintiffs' claims fail for all of these reasons, and the Court therefore need not determine whether Scott was disabled, as defined by the ADA.

### i. Exigent circumstances

The ADA does not reach the officers' conduct because they acted in the face of exigent circumstances. *See Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). In *Hainze*, police officers received a call from a woman requesting that the police transport her suicidal nephew, Hainze, to a hospital for mental health treatment. The woman advised the police that "Hainze had a history of depression and was under the influence of alcohol and anti-depressants, carrying a knife, and threatening to commit suicide or 'suicide by cop.'" *Id.* at 797. Two officers were dispatched to a convenience store where Hainze was located. Once there, the officers observed a man believed to be Hainze standing by the passenger door of an occupied pickup truck. Hainze appeared to be holding the truck door handle and talking to the truck occupants. Despite the admonition that Hainze intended to attempt "suicide by cop," one of the officers got out of his car, drew his weapon, and ordered Hainze away from the truck. Hainze responded with profanities, and, knife in hand, approached the officers. Hainze did not stop when ordered, and when he was within feet of an officer, that officer shot him twice in the chest.

Hainze claimed the county failed to reasonably accommodate his disability by refusing to adopt a policy protecting people with mental illness in a mental health crisis situation, thus

resulting in discriminatory treatment. The Fifth Circuit concluded, however, that "title II [of the ADA] does not apply to an officer's on-the-street responses to reported disturbances, whether or not those calls involve subjects with mental disabilities" until the responding officer has "secure[d] the scene" and "ensure[d] that there is no threat to human life." *Id.* at 801. In other words, "in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians," police officers are not required to comply with the ADA. *Id.*

> Here, when the officers decided to enter Scott's room, the officers:
>
> 1) knew that Scott's mother had called 911 for help involving Scott, 2) knew that Scott was schizophrenic, bi-polar and not taking his medication, 3) had probable cause to believe that Scott had left his room earlier that night and threatened to hit his mother, 4) knew that Scott was threatening his parents while yelling through the door, 5) knew that Cindy Rockwell felt threatened by Scott, 6) knew that Scott had been threatening the Officers personally by yelling through the door, 7) knew that Scott had a history of violence against his parents, 8) heard Scott banging against the walls and shaking his door aggressively, 9) had been told that it was unknown whether Scott's condition would improve if the Officers left without taking him along, 10) had reasonable suspicion that Scott was involved with illegal drugs based on his mother's testimony and his observed behavior, 11) knew that Scott had a history of being suicidal, 12) knew Scott was either armed or potentially armed, and 13) believed Scott to be claiming that he had been sexually molested.

*FCR* at 15–16. On these facts, the officers were justified in concluding the scene was not secure, and that Scott continued to pose a threat to his own life and to the lives of others. Accordingly, their decision to enter Scott's room does not give rise to a cause of action under the ADA.

      ii.    ADA accommodation

Plaintiffs claim the officers should have accommodated Scott's disability by either summoning a S.W.A.T. unit, or waiting for the situation to deescalate. Even if the ADA did apply to the officers' actions, the Court cannot conclude that Plaintiffs' requests for

accommodation are reasonable or required by the statute. In *Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171, 172 (4th Cir. 2009), the Fourth Circuit assessed a factually similar scenario. There, police officers engaged in two-hour standoff with a man, Hunt, known to have a history of mental illness and violence. Hunt had locked himself inside his apartment with his girlfriend. When the police arrived, the girlfriend assured them that she was okay, but explained that Hunt would not let her come to the door. Police attempted to negotiate with Hunt, but when he threatened the officers, they decided to enter the apartment and arrest him. The police entered the apartment. Hunt attacked an officer with a knife. Three officers shot and killed him.

The administrator of Hunt's estate sued the city, claiming the officers failed to accommodate Hunt's disability. The plaintiff argued that the department erred by banging on the door and yelling, thereby further agitating Hunt, and by failing to call a mental health professional or a family member to administer medication to Hunt. The Fourth Circuit disagreed. It noted that "[j]ust as the constraints of time figure in what is required of police under the Fourth Amendment, they bear on what is reasonable under the ADA." *Id.* at 175. The panel concluded, furthermore, that "it was unreasonable to expect the sorts of accommodations that plaintiff propose[d]," and that the officers exercised sound "discretionary judgment that [bore] on the reasonableness of any accommodation required." *Id.* at 175–77.

Here, too, the officers exercised sound discretionary judgment, and the ADA did not require them to take the actions requested. Lt. Brown, the supervisor at the scene, was a former S.W.A.T. unit member who had mental health training. When the officers decided the officers should enter, they had already waited thirty minutes. Scott had stopped responding, giving rise to a legitimate concern that he might harm himself. It is not clear how much longer Plaintiffs believe the officers should have waited, or what effect additional time would have had. In any

case, under these circumstances, the decision to enter was reasonable, and the ADA did not require the officers to wait any longer.

Nor did it require them to summon a S.W.A.T. unit. There is no indication that any one requested that they do so. Nor is there is evidence that the City discriminatorily denied Scott the service of the S.W.A.T. unit *by reason of his disability*. Furthermore, given the exigency of the circumstances, it was not unreasonable for Lt. Brown—himself a former S.W.A.T. unit member—to decide that the officers on the scene could handle the situation, and that they needed to enter Scott's room when they did. As in *Waller*, to "say that officers should have taken certain other actions during the standoff is to lean far in the direction of impermissible hindsight." *Id.* at 175–76.

      iii.    Causation

Finally, whether or not the officers violated the ADA by entering Scott's room, Scott's decision to attack the officers constituted an intervening force that broke the causal link between the alleged violation and the ultimate injury. In *Hainze*, the plaintiff claimed he was "denied the benefits" of the county's mental health training because the arresting officer "never engaged him in a conversation to calm him, never tried to give him space by backing away, never attempted to defuse the situation, never tried to use less than deadly force, and never attempted to create opportunities for the foregoing to occur." *Hainze*, 207 F.3d at 800–01. The Fifth Circuit concluded that regardless of whether the officer attempted to deescalate the situation, it was "Hainze's assault of [the officer] with a deadly weapon" that *caused* him to be deprived of the county's mental health training. Like Hainze, Scott broke the causal chain between the decision to enter the room and the shooting, by lunging at the officers with a deadly weapon. For this reason, too, Scott's ADA claim cannot survive.

IV. CONCLUSION

Scott's death is a great tragedy. But the facts of this case do not give rise to a claim under the ADA. When the officers decided to enter Scott's room, the scene was not yet secure. Therefore, the officers were not required to comply with the ADA. Moreover, the ADA did not require the officers to call a S.W.A.T. unit or to wait it out. Finally, the causal connection between the officers' decision to enter Scott's room and his death was interrupted by Scott's decision to attack the officers. Accordingly, the City's Motion is **GRANTED**, and Plaintiffs' claim is **DISMISSED with prejudice**. The City's Motions to Strike [Docket Entry Nos. 130 and 148] are **DENIED as moot**.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**